UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARMANDO LUIS, II,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>　　　　　Defendant. | Case No. 10-CV-2393-JLS (JMA)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DOC. NO. 14] AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT [DOC. NO. 15]** |

Plaintiff Armando Luis, II ("Plaintiff") seeks judicial review of the determination by Defendant Social Security Commissioner Michael J. Astrue's ("Defendant") that he is not entitled to supplemental security income ("SSI") benefits. The parties have filed cross-motions for summary judgment. For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**, that Defendant's cross-motion for summary judgment be **GRANTED IN PART** and **DENIED IN PART**, and that the case be remanded for further proceedings.

**I.　PROCEDURAL HISTORY**

Plaintiff protectively filed an application for SSI benefits on February 26, 2007 alleging a disability onset date of October 20, 1998 due to a learning disability and

epilepsy. (Admin. R. at 91, 147, 200.) Plaintiff's disability claim was denied initially on June 15, 2007 and again upon reconsideration on April 24, 2008. (Id. at 40-44, 48-53.) On or around June 23, 2008, Plaintiff requested an administrative hearing. (Id. at 21.) A hearing was conducted on March 24, 2009 by Administrative Law Judge ("ALJ") Peter J. Valentino, who determined Plaintiff was not disabled. (Id. at 7-16.) Plaintiff requested a review of the ALJ's decision (id. at 5-6); the Appeals Council for the Social Security Administration ("SSA") denied Plaintiff's request for review on September 17, 2010 (id. at 1-3). Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

## II. FACTUAL BACKGROUND

Plaintiff was born on February 16, 1989. (Id. at 91.) He resides with his parents and siblings. (Id. at 225.) He has had a seizure disorder since he was nine months old. (Id. at 25, 211.) At the time he filed his application for SSI, he was 18 years old, in eleventh grade, and was receiving one-on-one special education instruction at home through San Diego Unified School District. (Id. at 155, 163.) He was not attending a regular high school because of his seizure disorders. (Id.) He was receiving reading instruction at a third grade level, math instruction at a fourth grade level, and written language instruction at a third grade level. (Id.)

## III. MEDICAL EVIDENCE

### A. Kaiser Permanente, Treating Physicians (2006-2007)

On June 21, 2006, Plaintiff, then 17 years of age, was brought to the emergency room at Kaiser Permanente ("Kaiser") after experiencing a major motor seizure. (Id. at 394-96.) He reported he had slept late that morning and had missed taking Topamax, his anti-seizure medicine. (Id. at 392, 394.) He was on the computer at his sister's house when she witnessed him falling backward onto the carpeted floor and called paramedics. (Id. at 394.) Plaintiff stated his first seizure occurred about eight years prior and the only time his seizures had been frequent and uncontrolled was for a year after that. (Id.) His last seizure occurred about 1½ years earlier. (Id.) The emergency room physician concluded the seizure may have been due to sleep deprivation and

medication non-compliance, and noted Plaintiff's prescription frequency was not consistent with regular use unless he had filled his prescriptions outside of Kaiser. (Id. at 392, 396.)

Plaintiff followed-up with Richard A. Kaplan, M.D., his neurologist, in August 2006. Dr. Kaplan, who noted Plaintiff's diagnoses as seizure disorder and learning disorder, advised him to continue taking Topamax 100 mg 1-2 times per day and referred him for an electroencephalogram (EEG) and blood test. (Id. at 252.) The EEG results were normal. (Id. at 254.) In September 2006, Plaintiff reported to the pediatric department that frequent headaches caused him to miss a lot of school. (Id. at 253.)

On November 28, 2006, Plaintiff presented to the emergency room after experiencing two seizures. (Id. at 262-64.) The first seizure consisted of 30-60 seconds of total body shaking followed by a postictal phase,[1] at which time Plaintiff then experienced another 10-30 second seizure. (Id. at 262.) Dr. Kaplan, who was consulted by the emergency room, recommended that Plaintiff's Topamax be increased to 200 mg twice per day. (Id. at 263.) The following day, Dr. Kaplan referred Plaintiff for a neurosurgical consultation after a brain MRI performed in October 2006 showed a right temporal developmental venous anomaly. (Id. at 259-60, 277-78.) The neurosurgeon, Dr. Jeffrey A. Lee, compared the MRI scan with a MRI scan performed in January 2004 (see id. at 283) and determined the venous anomaly was not the cause of Plaintiff's seizures and that surgical removal was not indicated. (Id. at 260.)

On February 15, 2007, Plaintiff was diagnosed with a muscle strain/sprain of his right arm which occurred when he suffered a seizure two days prior. (Id. at 261.) Ten days later, on February 25, 2007, Plaintiff went to Urgent Care after flipping on an ATV/4-wheeler and landing on his left hand. (Id. at 386.) X-rays were negative for fracture. (Id. at 272, 386.)

On July 27, 2007, Plaintiff was brought to the emergency room by emergency

---

[1] The "postictal" period following a seizure signifies the recovery period for the brain when the individual transitions from the seizure back to his or her normal state. http://www.epilepsy.com/101/ep101_symptom (as visited July 26, 2012).

medical services after having a seizure. (Id. at 387-88.) He was admitted into the hospital for three days. (Id. at 345.) According to his medical chart, Plaintiff had not been compliant with his medicine (Topamax 200 mg in the morning and 300 mg in the afternoon) over the past day or so. (Id. at 387.) A CT scan of the brain was unremarkable. (Id. at 355.) Plaintiff followed up with Jalali Mahnaz, M.D. in August 2007, who referred him for blood tests and advised him to continue with his present dosages of Topamax, to follow up with his neurologist as scheduled, and to follow up with him in three months. (Id. at 345-46.)

**B.   C. Valette, Ph.D, Valette & Associates, Examining Psychologist (2007)**

Plaintiff underwent a psychological evaluation with Dr. C. Valette on May 21, 2007 at the request of the Department of Social Services. (Id. at 310-14.) Dr. Valette tested Plaintiff using the Wechsler Adult Intelligence Scale-III, which rendered a verbal IQ score of 71, a performance IQ of 72, and a full scale IQ of 69. (Id. at 313.) Dr. Valette opined that the scores were slightly deflated and that Plaintiff's intellectual functioning was in the low average range. (Id.) She found Plaintiff's memory to be functioning minimally in the borderline range and noted that a learning disorder was apparent. (Id.) She determined Plaintiff had slight limitations in his abilities to complete detailed tasks, complete complex tasks, and to concentrate for at least two-hour increments at a time, but had no limitations in his abilities to socially interact with others, understand instructions, sustain an ordinary routine without sustained supervision, complete simple tasks, avoid normal hazards, and handle funds. (Id. at 313-14.)

**C.   Kenneth Stover, D.O., Seagate Medical Group, Examining Physician (2010)**

Plaintiff underwent a neurological evaluation with Dr. Kenneth Stover of Seagate Medical Group on May 26, 2010 at the request of the Department of Social Services. (Id. at 407-10.) Dr. Stover opined that from a neurologic standpoint,

> [Plaintiff] is not restricted in standing and walking or lifting and carrying. He is not restricted in sitting, pushing, or pulling. However, postural functions are totally restricted in climbing and balancing due to his seizure disorder but not stooping, kneeling, or crouching. There are no manipulative limitations as to reaching, handling, fingering, or feeling. There are no visual restrictions. Communicative restrictions may be an

> issue. This may need to be evaluated by psychometric and learning testing for specific educational levels. Since the claimant has a seizure disorder, he should avoid heights, heat, heavy machinery, being about significant bodies of water, and driving motorized vehicles.

(Id. at 409.)

### D.    S.A. Brodsky, D.O., Non-Examining Doctor (2007)

On May 31, 2007, state agency physician S.A. Brodsky, D.O. conducted an analysis of Plaintiff's disability claim. (Id. at 315-17.) Dr. Brodsky acknowledged Plaintiff had a severe mental disability, but found he did not meet or equal listings 11.02 or 11.03 (relating to epilepsy) and stated Plaintiff's only physical limitation was that he had to avoid unprotected heights and moving machinery. (Id. at 317.)

### E.    Robert Paxton, M.D., Non-Examining Doctor (2007)

On June 4, 2007, state agency physician Robert Paxton, M.D. found on a Psychiatric Review Technique Form ("PRTF") that Plaintiff did not have a severe impairment. (Id. at 318.) As such, Dr. Paxton left the remainder of the PRTF blank. (Id. at 318-28.)

### F.    Herb N. Hurwitz, M.D., Non-Examining Doctor (2008)

On April 17, 2008, state agency physician Herb N. Hurwitz, M.D. conducted an analysis of Plaintiff's disability claim pursuant to Plaintiff's request for reconsideration of the initial denial of his claim. (Id. at 397-98.) Dr. Hurwitz affirmed the initial findings. (Id. at 398.)

## IV.    SCHOOL RECORDS

Plaintiff was referred for a multidisciplinary special education evaluation in February 2009 as part of a three-year reevaluation for Special Education Services in the Grossmont Union High School District. (Id. at 225-38.) On March 10, 2009, Plaintiff's verbal IQ score was 72 (3rd percentile), performance IQ was 105 (63rd percentile), and full scale IQ was 85 (16th percentile) using the Wechsler Adult Intelligence Scale-III. (Id. at 230.) Plaintiff was found to meet the criteria for a Specific Learning Disability, and demonstrated a severe discrepancy between his intellectual ability and achievement in

basic reading skills, reading comprehension, math calculations, math reasoning, and written expression due to an auditory processing disorder. (Id. at 235.)

## V. THE ADMINISTRATIVE HEARING

The ALJ conducted an administrative hearing on March 24, 2009. (Id. at 22.) Plaintiff, the only witness, testified he was in twelfth grade at Mount Miguel High School and planned to go to college to become an architect once he graduated. (Id. at 26.) He stated he would finish high school once he has enough credits; he was not sure how many more credits he needed to graduate. (Id. at 26-27.) He had been taking special education classes since attending Mount Miguel. (Id. at 27.) He had not ever worked anywhere part-time. (Id.) He has treated with doctors at Kaiser since he was two years old, and Dr. Kaplan has been his treating neurologist since he was nine years old. (Id. at 28, 30.) He had last seen Dr. Kaplan about four months previously. (Id. at 27-28.)

Plaintiff testified he sometimes takes his seizure medicine, Topamax, but he sometimes forgets to take it. (Id. at 29.) He had been having a teacher come to his home for the past three years because of his medical condition. (Id. at 29-30.) He enjoys reading sports magazines, watching SportsCenter, watching movies, and playing video games. (Id. at 31-32.) He does not have a driver's license. (Id. at 32.) His parents usually take him where he needs to go but he rides the bus or trolley about once per week to go to his friends' houses. (Id. at 32-33.) He goes to the mall and movies with his friends, and attends church twice per week with his family. (Id. at 33-34.) He could not provide the pastor's name because he is "not good with names." (Id.) His household chores include cleaning the yard and cleaning his room. (Id. at 35-36.)

## VI. THE ALJ DECISION

After considering the record, ALJ Valentino made the following findings:

1. The claimant has not engaged in substantial gainful activity since February 28, 2007, the application date [citation omitted].

2. The claimant has the following severe impairments: learning disorder and epilepsy [citation omitted].

6

10cv2393

|   |     |                                                                                                                                                                                                                                                                                                                                                                                                                                                             |
|---|-----|-----|
| 3.  | The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in [the Social Security Regulations]. |
| 4.  | After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 416.967(c) except occasional bending, crouching, stooping, balancing, climbing, and kneeling; avoid being around heights, heat, heavy machinery, significant bodies of water; no driving motorized vehicles. |

. . . .

| 8.  | The claimant has no transferable job skills because he has no past relevant work. |
| 9.  | Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform [citations omitted]. |
| 10. | The claimant has not been under a disability, as defined in the Social Security Act, since February 28, 2007, the date the application was filed [citation omitted]. |

(Id. at 12-15.)

**VII.   STANDARD OF REVIEW**

To qualify for disability benefits under the Social Security Act, an applicant must show: (1) He or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C. § 423(d)(1)(A), (2)(A). An applicant must meet both requirements to be "disabled." Id. Further, the applicant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

**A.   Sequential Evaluation of Impairments**

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the claimant is

presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work he has done in the past. If so, the claimant is not disabled. If not, the evaluation continues to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 C.F.R. § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999). The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five. Tackett, 180 F.3d at 1099.

**B.     Judicial Review**

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless: (1) The ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v. Astrue, 572

F.3d 586, 591 (9th Cir. 2009) (citing Andrews, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. Vasquez, 572 F.3d at 591 (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g). The matter may also be remanded to the SSA for further proceedings. Id.

## VIII. DISCUSSION

Plaintiff contends the ALJ's decision to deny him SSI benefits was legally improper and was not supported by substantial evidence. Plaintiff makes the following arguments: First, that the ALJ erred in finding Plaintiff did not meet or equal listing 12.05(C); second, that the ALJ erred in applying the grid rules when Plaintiff had a "borderline IQ"; and third, that the ALJ failed to properly formulate Plaintiff's residual functional capacity.

### A. The ALJ Did Not Err By Not Finding Plaintiff Disabled Under Listing 12.05(C)

Plaintiff first argues that the ALJ erred in finding he does not meet or equal Listing 12.05(C) of the Listing of Impairments. (Pl.'s Mem. at 5.) The Listing of Impairments sets forth certain impairments which are considered to be of sufficient severity as to be considered presumptively disabling. See 20 C.F.R. § 416.925(a). To meet a Listing, the claimant must have a medically determinable impairment that satisfies all criteria of the listing. See 20 C.F.R. § 416.925(d); Key v. Heckler, 754 F.2d 1545, 1549-50 (9th Cir. 1985). A claimant has the burden of proving disability, including disability based on the Listings. See Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995).

Listing 12.05, Mental Retardation, refers to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. "The required

level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied." Id. Plaintiff's argument focuses upon the paragraph C criteria: "A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id., § 12.05(C). Specifically, Plaintiff contends his full scale IQ score of 69, noted by Dr. Valette in May 2007, satisfies the IQ score requirement of paragraph C. (Pl.'s Mem. at 5 [citing Admin. R. at 313].)

The Listing of Impairments requires an IQ score to be a valid score. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C). The IQ scores referenced in Listing 12.05 reflect values from tests of general intelligence, including the Wechsler series. Id., § 12.00(D)(6)(c). The lowest of the three IQs measured by the Wechsler series (verbal, performance, and full scale) are to be used when evaluating Listing 12.05. Id. "However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." Id., § 12.00(D)(6)(a).

The ALJ did not explicitly discuss Listing 12.05(C) in his decision. Rather, he found generally that Plaintiff did not meet or equal any of the impairments set forth in the Listing of Impairments, and observed that none of the state agency physicians had found Plaintiff's condition to meet or equal any listing. (Admin. R. at 12.) The ALJ also did not explicitly reference the IQ score of 69. Rather, with respect to Dr. Valette's opinion, the ALJ noted that when Plaintiff was tested in May 2007, i.e., when Dr. Valette conducted her testing, Plaintiff was determined to be functioning intellectually in the low average range (as opposed to a range reflecting mental retardation). (Id.) The ALJ gave "significant weight" to Dr. Valette's opinion and found her opinion was "consistent with the test scores of record as well as the clinical findings from treating sources." (Id. at 14.)

//

While Plaintiff's full scale IQ score of 69, if valid, would satisfy the IQ requirement of Listing 12.05(C), the score is of doubtful validity. Dr. Valette found Plaintiff's IQ scores, which were obtained on a test she herself administered, to be inconsistent with her assessment of his intellectual functioning: "These scores are slightly deflated. It is estimated that he is intellectually functioning in the low average range." (Admin. R. at 313.) She explained further, "Given test results and clinical data, it is estimated that the claimant is intellectually functioning in the low average range." (Id.) These opinions are, as the ALJ correctly observed, consistent with other evidence in the record, including Plaintiff's subsequent IQ scores administered in March 2009 by his school district: a verbal IQ score of 72, a performance IQ score of 105, and a full scale IQ score of 85 (id. at 230), as well as the non-examining physicians' opinions (id. at 315-17, 318, 397-98).

An ALJ may properly assess the reliability of IQ scores by examining the record. See, e.g., Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998). For purposes of the Court's review, the question is whether the ALJ's decision to disregard an IQ score is supported by substantial evidence in the record as a whole. Id. Here, the ALJ did not mention or consider Plaintiff's full scale IQ score of 69. However, based on the record, it was proper for him to disregard that score because the score was not valid, even in the view of the test administrator, Dr. Valette, nor was it consistent with other evidence in the record. It was wholly proper under the Regulations for the ALJ to give greater weight to Dr. Valette's narrative findings than to the IQ score. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(a). Because Plaintiff's IQ score of 69 was not valid, the ALJ did not commit error by not finding Plaintiff disabled under Listing 12.05(C).

**B.  The ALJ Did Not Commit Error by Relying on the Grids Notwithstanding Plaintiff's Alleged Borderline Intellectual Functioning**

Plaintiff next contends the ALJ erred by relying on the "grids" to show a significant number of jobs in the national economy that Plaintiff can perform. (Pl.'s Mem. at 5.) He argues the ALJ should have consulted a vocational expert ("VE") rather

than relying on the grids because Plaintiff's "borderline IQ"[2] constitutes a "significant nonexertional impairment." (Id. at 5-6.)

At step five, the ALJ may obtain the testimony of a VE or may refer to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2 (commonly referred to as "the grids") to meet the burden of showing there is other work in significant numbers in the national economy the claimant can perform. Tackett, 180 F.3d at 1100-01. The factors in the grids include the claimant's age, education, and work experience, and for each combination of these factors, the grids direct a finding of either "disabled" or "non-disabled." Id. at 1101. Use of the grids at step five is justified so long as they *completely and accurately* represent a claimant's limitations. Id. (emphasis in original). Significant nonexertional impairments may make reliance on the grids inappropriate. Desrosiers, 846 F.2d at 577.[3] The fact that a nonexertional limitation is alleged, however, does not automatically preclude application of the grids. Id. The ALJ must first determine if the nonexertional limitations significantly limit the range of work permitted by a claimant's exertional limitations. Id. Only if a nonexertional impairment limits the claimant's functional capacity in ways not contemplated by the grids would use of the grids be inappropriate. Id.; see also Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), *overruled on other grounds by* Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991).

Here, in determining that Plaintiff was not disabled, the ALJ relied on Medical-

---

[2] "Borderline" intellectual functioning is a "categorization of intelligence in which a person has below average cognitive ability, that is, an IQ of 71-85, but the deficit is not as severe as mental retardation, which is defined as an IQ of 70 or below." Baines v. Astrue, 2011 WL 3759040, at *3 (C.D. Cal. 2011) (citing Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV)).

[3] "Exertional capacity" relates to an individual's physical strength and ability to perform the following seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. See Social Security Regulation ("SSR") 96-8P, 1996 WL 374184, at *5. "Nonexertional capacity" relates to the limitations and restrictions not reflected in the seven strength demands, and concerns an individual's postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) abilities, as well as the individual's ability to tolerate various environmental factors. Id. at *6.

Vocational Rule 203.26,[4] reflecting that Plaintiff had the residual functional capacity to perform medium, unskilled work. See 20 C.F.R. pt. 404, subpt. P, app. 2, § 203.26; id., § 203.00(b) (grids reflect the occupational base of administratively noticed unskilled jobs). "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. See 20 C.F.R. § 416.967(c). "Unskilled work" is "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." Id., § 416.968(a). "Unskilled occupations are the least complex types of work." See Social Security Regulation ("SSR") 82-41, 1982 WL 31389, at *1.

Plaintiff relies on the fact of his full scale IQ score of 69, which he erroneously refers to as his "most recent" IQ score (see Pl.'s Mem. at 6), to contend the ALJ erred by relying on the grids to show a significant number of jobs in the national economy that Plaintiff can perform. Plaintiff, citing three cases from the Eighth Circuit, argues the existence of a "borderline IQ score" requires an ALJ to consult a VE regarding the nonexertional impairments imposed by borderline intellectual functioning and prohibits the ALJ from relying on the grids. (Pl.'s Mem. at 5-6.) The cases cited by Plaintiff, however, do not support his position. In Lucy v. Chater, 113 F.3d 905 (8th Cir. 1997), the court found the plaintiff's borderline intellectual functioning had to be considered by a VE because the record supported the plaintiff's contention that he had borderline intellectual functioning. Id. at 908. In Pickney v. Chater, 96 F.3d 294 (8th Cir. 1996), the court held that because the plaintiff's borderline intellectual functioning, which had been diagnosed by a psychologist, was supported by the record, the plaintiff was entitled to have a VE consider this along with his other impairments. Id. at 297. This, the court observed, was required by the longstanding rule that a hypothetical question posed to a VE must reflect all of a claimant's vocational limitations. Id. In Foreman v.

---

[4] Because Plaintiff had no past relevant work (see Admin. R. at 15), the ALJ likely intended to refer to Medical-Vocational Rule 203.25 (younger individual, limited education, unskilled or no past relevant work) rather than Rule 203.26 (younger individual, limited education, skilled or semiskilled with skills not transferable). This error is harmless, however. See, e.g., Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990) (applying harmless error rule).

Callahan, 122 F.3d 24 (8th Cir. 1997), the court held there was not sufficient evidence in the record for the ALJ to conclude that Foreman's mental impairment was not significant as the ALJ specifically found Foreman to have borderline intellectual functioning. Id. at 26. In each of these cases, the record substantiated that the claimant had borderline intellectual functioning with significant vocational limitations. Therefore, those limitations had to be included in any hypothetical question presented to a VE for the purpose of a Step 5 determination.

Here, in contrast, Plaintiff has not established that he has "borderline intellectual functioning." Although some of the IQ scores in the record fall within the "borderline" range, Plaintiff has not been diagnosed with borderline intellectual functioning, and he has pointed to no evidence in the record beyond the single IQ score of 69 which, as discussed above, is of doubtful validity, to show borderline intellectual functioning. Plaintiff has not presented any evidence or argument that he has significant vocational limitations as a result of his intellectual functioning. He has thus not met his burden of demonstrating that he has a medically determinable impairment that renders him incapable of performing work. See, e.g., Johnson, 60 F.3d at 1432. Instead, there is substantial evidence in the record supporting the ALJ's finding that Plaintiff's mental impairment did not present any significant vocational limitations. The ALJ expressly determined that Plaintiff's limitations would have "little to no effect on the occupational base of unskilled medium work." (Admin. R. at 15.) This finding is supported by substantial evidence in the record, including Dr. Valette's determination that Plaintiff was functioning intellectually in the "low average" range and that his vocational limitations consisted of only slight limitations in his abilities to complete detailed tasks, complete complex tasks, and to concentrate for at least two-hour increments at a time (see id. at 313-14), none of which preclude the performance of unskilled work. See 20 C.F.R. § 416.968(a) (definition of unskilled work).

After considering the evidence in the record, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff's mental impairment did not affect the

occupational base of medium, unskilled work.

**C.  The ALJ Erred in Determining Plaintiff's Residual Functional Capacity and By Failing to Consult with a Vocational Expert Regarding Plaintiff's Non-Mental Nonexertional Impairments**

Plaintiff's final argument is that the ALJ erred in determining Plaintiff's residual functional capacity ("RFC"). (Pl.'s Mem. at 6-7.)

A claimant's RFC is an assessment of the individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, which means eight hours per day, for five days per week, or an equivalent work schedule. SSR 96-8P, 1996 WL 374184, at *1. A RFC is based on all relevant evidence in the claimant's case record. 20 C.F.R. § 404.1545(a)(1). The RFC is used at Step 4 and, if necessary, Step 5 of the sequential evaluation process to decide whether the claimant is disabled. Id. at *2; 20 C.F.R. § 404.1545(a)(5). Here, the ALJ formulated Plaintiff's RFC as follows:

> [Plaintiff] has the residual functional capacity to perform medium work as defined in [20 C.F.R. § 416.967(c)] except occasional bending, crouching, stooping, *balancing*, *climbing*, and kneeling; avoid being around heights, heat, heavy machinery, significant bodies of water; no driving motorized vehicles.

See Admin. R. at 13 (emphasis added). Clearly, the ALJ relied upon Dr. Stover's opinion in developing Plaintiff's RFC. See id. at 14 ("the above residual functional capacity assessment is supported by Dr. Stover" and "I have given significant weight to the opinion of Kenneth Stover"). The pertinent section of Dr. Stover's assessment, however, provides:

> [Plaintiff] is not restricted in standing and walking or lifting and carrying. He is not restricted in sitting, pushing, or pulling. However, postural functions are *totally restricted in climbing and balancing* due to his seizure disorder but not stooping, kneeling, or crouching.

Id. at 409 (emphasis added). Thus, there is a discrepancy between the ALJ's and Dr. Stover's RFC determination as to whether Plaintiff is totally restricted from climbing and balancing, or whether he may occasionally climb and balance. Given that the ALJ placed great weight on Dr. Stover's opinion, and in particular Dr. Stover's endorsement

of "seizure precautions" (see id. at 14), it appears the ALJ did not reject Dr. Stover's opinion as surmised by Plaintiff, but rather misread Dr. Stover's opinion.

Defendant, relying on two Social Security Regulations ("SSRs"), argues that this misreading of Dr. Stover's opinion was harmless error as an inability to climb or balance would not have affected the applicability of the grids or the ALJ's ultimate decision. (Def.'s Mem. at 9.) The SSRs, however, compel a different conclusion. SSR 83-14 expressly provides that a limitation on the ability to maintain body equilibrium (i.e., the ability to balance)[5] "can affect the capacity to perform certain jobs at all levels of physical exertion." SSR 83-14, 1983 WL 31254, at *2. "An entire range of jobs can be severely compromised." Id. As to climbing, the SSRs do provide that an inability to "ascend or descend ladders and scaffolding" would not significantly affect the occupational base. See id. at *5. However, they also state, "Where a person has *some* limitation in climbing and balancing and it is the *only* limitation, it would not ordinarily have a significant impact on the broad world of work." SSR 85-15, 1985 WL 56857, at *6 (emphases added). Here, however, Plaintiff has a *complete* limitation not only to *both* climbing and balancing, but *also* to heights, heat, heavy machinery, being about significant bodies of water, and driving motorized vehicles. (Admin. R. at 13, 409.)

The SSRs recommend using a VE when a claimant has limitations on the ability to balance. Edwards v. Astrue, 2012 WL 1029390, at *10 (N.D. Cal. 2012); SSR 96-9P, 1996 WL 374185, at *7; SSR 85-15 at *6. They also recommend consultation with a VE or occupational reference materials when the impact of environmental restrictions, including extremes of temperature, unprotected elevations, and dangerous moving machinery, are difficult to ascertain. SSR 85-15, at *8. The ALJ did not consult with a VE regarding these limitations, leaving unclear the impact of Plaintiff's limitations on the occupational base of medium, unskilled work. Thus, the ALJ erred.

//

---

[5] "Balancing" means maintaining body equilibrium. SSR 96-9P, 1996 WL 374185, at *7.

In sum, the Court cannot conclude, on the present record, that Plaintiff's complete limitation from climbing and balancing, as well as his need to avoid heights, heat, heavy machinery, being about significant bodies of water, and driving motorized vehicles, would not erode the occupational base for unskilled medium work. "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded." Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981). Accordingly, the Court recommends that the case be remanded to allow the ALJ to obtain the opinion of a VE regarding the effects of Plaintiff's non-mental nonexertional limitations, specified above, on the occupational base for medium, unskilled medium work.

## IX. CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment should be **GRANTED IN PART** and **DENIED IN PART**, Defendant's cross-motion for summary judgment should be **GRANTED IN PART** and **DENIED IN PART**, and the case should be remanded for further proceedings.

This report and recommendation will be submitted to the Honorable Janis L. Sammartino, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **August 15, 2012**. The document should be captioned "Objections to Report and Recommendation." Any reply to the Objections shall be served and filed on or before **August 29, 2012**. The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 1, 2012

Jan M. Adler
U.S. Magistrate Judge